| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Kevin D. McCullough, Plan Trustee for Pine Creek Medical Center, LLC Plan Trust | Dr. Manuel Ramirez |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| Shannon Thomas, and Zachary Levick of Rochelle McCullough, LLP, 325 North Saint Paul St., Suite 4500, Dallas, TX 75201 214-953-0182 | |

| PARTY (Check One Box Only) | PARTY (Check One Box Only) |
|---|---|
| □ Debtor      □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor    □ Other<br>☒ Trustee | □ Debtor      □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor    ☒ Other<br>□ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Trustee of Debtor's liquidating trust suing Debtor's board member for breach of fiduciary duty, corporate waste, unjust enrichment, abuse of control, gross mismanagement and fraudulent transfers.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
11-Recovery of money/property - §542 turnover of property
☐2 12-Recovery of money/property - §547 preference
☐2 13-Recovery of money/property - §548 fraudulent transfer
14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐1 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $  $10,487,000 |

| Other Relief Sought |
|---|
| |

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Pine Creek Medical Center, LLC | BANKRUPTCY CASE NO.<br>19-33079-HDH11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Judge Scott W. Everett |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE | PRINT NAME OF ATTORNEY (OR PLAINTIFF) | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located.  Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate.  There also may be lawsuits concerning the debtor's discharge.  If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF).  (CM/ECF captures the information on Form 1040 as part of the filing process.)  When completed, the cover sheet summarizes basic information on the adversary proceeding.  The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court.  The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney).  A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.**  Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.**  Give the names and addresses of the attorneys, if known.

**Party**.  Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.**  Enter the dollar amount being demanded in the complaint.

**Signature.**  This cover sheet must be signed by the attorney of record in the box on the second page of the form.  If the plaintiff is represented by a law firm, a member of the firm must sign.  If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

Shannon S. Thomas
State Bar No. 24088442
Zachary G. Levick
State Bar No. 24119380
ROCHELLE McCULLOUGH, LLP
325 N. St. Paul Street, Suite 4500
Dallas, Texas 75201
Telephone:  214-953-0182
Facsimile:  214-953-0185
sthomas@romclaw.com
zlevick@romclaw.com

ATTORNEYS FOR KEVIN D. MCCULLOUGH,
PLAN TRUSTEE OF THE PINE CREEK MEDICAL
CENTER, LLC PLAN TRUST

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CHAPTER 11** |
| **PINE CREEK MEDICAL CENTER, LLC** | § | |
| | § | **CASE NO. 19-33079-HDH11** |
| | § | |
| Debtor. | | |
| **KEVIN D. MCCULLOUGH, PLAN TRUSTEE OF PINE CREEK MEDICAL CENTER, LLC PLAN TRUST,** | § | |
| | § | |
| | § | |
| | § | |
| **PLAINTIFF,** | § | |
| | § | |
| v. | § | |
| | § | |
| **DR. MANUEL RAMIREZ,** | § | |
| | § | |
| **DEFENDANT.** | § | **ADV. CASE NO. 22-_____** |
| | § | |
| | § | |
| | § | |

**PLAN TRUSTEE'S ORIGINAL ADVERSARY COMPLAINT**

TO THE HONORABLE SCOTT W. EVERETT,
UNITED STATES BANKRUPTCY JUDGE:

NOW COMES, Plaintiff Kevin D. McCullough, Plan Trustee of the Pine Creek Medical Center, LLC Plan Trust (the "**Plan Trustee**"), and files this *Original Adversary Complaint* (the "**Complaint**") against Dr. Manuel Ramirez ("**Dr. M. Ramirez**" or the "**Defendant**") former board member of Pine Creek Medical Center, LLC ("**Pine Creek**" or the "**Debtor**"), and in support thereof respectfully states as follows:

## I.    SUMMARY OF CLAIMS

1.    Pine Creek filed for bankruptcy following an expensive *qui tam* settlement with the U.S. Department of Health and Human Services Office of Inspector General (the "**OIG**"). While the gross mismanagement of Pine Creek was perpetuated by its CEO, Dr. Corazon Ramirez, and her affiliated entities, those tasked with managing the entity – including individual board members such as Dr. M. Ramirez – are equally responsible for the hospital's demise, because without their abject negligence it would not have occurred. As a member of the Pine Creek Board of Managers (the "**Board**"), Dr. M. Ramirez failed to implement meaningful compliance policies and regulatory controls; failed to maintain accurate books and records; operated Pine Creek with gross inefficiencies; habitually ignored serious conflicts of interest and disregarded corporate formalities. These misdeeds, each a breach of fiduciary duty, also constituted an abuse of control and gross mismanagement which contributed to the hospital's downward spiral. Further, by serving as nothing more than a "rubber stamp" on the former CEO's self-serving behavior and management decisions, Dr. M. Ramirez caused the hospital to waste valuable corporate assets and incur millions of dollars of legal fees defending and settling various government investigations. Pine Creek also expended many millions in management fees, essentially paying two separate

entities for management services, despite neither providing adequate services sufficient to keep Pine Creek in compliance or afloat financially.

## II.    JURISDICTION AND VENUE

2.    The Court has jurisdiction over this adversary proceeding, because the causes of action set forth herein constitute a core matter pursuant to 28 U.S.C. §§ 157 and 1334.

3.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. Pursuant to 28 U.S.C. § 1391, venue is also appropriate as the defendants identified herein are authorized to and regularly carry out substantial business in this district and the acts and conduct complained of herein took place within this district. Accordingly, this Court also has personal jurisdiction over the defendants.

## III.    PARTIES

4.    Plaintiff Kevin D. McCullough is the Plan Trustee, duly appointed to administer Pine Creek's assets, including estate causes of action. The Debtor's First Amended Chapter 11 Plan of Liquidation Dated September 20, 2019 (the "**Plan**") was confirmed by Order entered February 24, 2020 [Dkt. No. 113] (the "**Confirmation Order**"). The Plan went effective on March 16, 2020 [Dkt. No. 119]. The Plan called for the creation of the Pine Creek Medical Center, LLC Plan Trust (the "**Trust**"), which is governed by the Pine Creek Medical Center, LLC Plan Trust Agreement (the "**Trust Agreement**"), whereby the Plan Trustee was appointed. The Plan Trustee is a legal entity separate and distinct from the Debtor, and institutes these claims on behalf of the Pine Creek Medical Center, LLC Plan Trust.

5.    Defendant Dr. Manuel Ramirez ("**Dr. M. Ramirez**") served on the Pine Creek Board of Managers from 2012 - 2017. Dr. M. Ramirez may be served with process at the place

where he regularly conducts a business or profession at the Center for Pain Relief at 4225 Wingren

Dr., Suite 205, Irving, TX 75062

## IV.    PROCEDURAL BACKGROUND

6.      On September 13, 2019, (the "**Petition Date**"), Pine Creek commenced the above-

captioned Chapter 11 case by filing a voluntary petition for relief under Chapter 11 of Title 11 of

the United States Code §§ 101, *et seq.* (the "**Bankruptcy Code**"). The Plan called for the creation

of the Trust, which is governed by the Trust Agreement and appointed Kevin D. McCullough as

the Plan Trustee to administer the Trust assets.

7.      The Plan specifically provides that all Debtor causes of action were conveyed to

the Plan Trustee, giving him the sole discretion to evaluate and bring claims on Pine Creek's

behalf. *See* Plan at p. 11, Section 6.1. Both the Plan and the *Debtor's First Amended Disclosure*

*Statement regarding its Chapter 11 Plan of Liquidation dated September 20, 2019* (the

"**Disclosure Statement**") [Dkt. No. 78] specifically put the defendant, as a board member,

manager, and person controlling the Debtor, on notice that he may be sued by the Plan Trustee

pursuant to his role managing Pine Creek prior to the Petition Date. *See* Plan at p. 12; Disclosure

Statement at p. 22.

## V.    FACTUAL BACKGROUND

8.      Pine Creek was founded as a physician owned acute care hospital in 2003 by eleven

(11) physicians. Management responsibility for the Debtor purportedly fell under the purview of

the Pine Creek Board of Managers (the "**Board**"). While Pine Creek had dozens of physician

investors, all decisions related to the facility, including the day-to-day management, were made in

practice by Pine Creek's former CEO. Dr. M. Ramirez, who served as a board member during the

relevant period, had the authority to oversee this decision-maker, but failed to do so in flagrant breach of his fiduciary duty to the Debtor, causing irreparable harm to Pine Creek.

### A. Pine Creek Management Structure

9.      Initially, Pine Creek was purported to be managed by PCR Management, LP ("**PCR Mgmt.**"), which executed the Development and Management Agreement (the "**Management Agreement**") with Pine Creek in October 2003.[1] Pine Creek's former CEO signed the Management Agreement on behalf of both parties, executing on behalf of PCR General, Inc.[2] ("**PCR General**") and also executing on behalf of Pine Creek as its President. Thereafter, the Management Agreement was amended in 2012 to correctly identify – after 9 years – Pine Creek's management company as Pine Creek Management, LP.[3] The Management Agreement was amended a third time on October 31, 2017.  In each instance, from Pine Creek's inception, the same former CEO of Pine Creek stood on both sides of the Pine Creek management transactions. Pine Creek Management, LP converted to PSG-Pine Creek Management, LLC ("**PSG-PC Mgmt.**") on August 19, 2013.[4] PSG-PC Mgmt. was started by the same founding members of Pine Creek in order to develop and manage the hospital.

10.      In addition to the physician owners, PSG-PC Mgmt. was owned in part and controlled by Physician Synergy Group ("**Synergy**"). Synergy was founded in 2008 for the purpose of providing healthcare development services and administrative and management

---

[1] As it relates to PCR Mgmt., no such entity was ever registered with the Texas Secretary of State.

[2] PCR General, Inc. was identified as the general partner of PCR Management, LP.

[3] This represented the second amendment to the Management Agreement, as it was previously amended in 2008 to extend its terms for an additional five years.

[4] PSG-PC Mgmt. served as the relevant management company of Pine Creek until Partners Surgical of Pine Creek, LLC took over management of Pine Creek in November 2017.

services to healthcare facilities, including day-to-day operational management. As of October 31, 2016, Synergy owned 40% of PSG-PC Mgmt.[5]

11.     Under PSG-PC Mgmt.'s company agreement, Synergy served as the sole "manager" of PSG-PC Mgmt. with full authority to manage PSG-PC Mgmt. and its operations. In this capacity, Synergy appointed Pine Creek's former CEO as President of PSG-PC Mgmt. in charge of daily operations. Although Synergy did not have a contract with Pine Creek, it nonetheless held itself out as a de facto manager of the hospital.

**B.  *Qui Tam* / OIG Investigation**

12.     In August 2014, a complaint under the Federal False Claims Act was filed under seal against Pine Creek (the "***Qui Tam* Complaint**"). The *Qui Tam* Complaint was initiated by two whistleblowers, both former marketing employees of Pine Creek who alleged Stark Law and Anti-Kickback violations. Specifically, the *Qui Tam* Complaint alleged that Pine Creek violated Stark and Anti-Kickback regulations by inducing and accepting referrals of Medicare patients from physicians with whom the hospital had financial relationships. The improper financial relationships were alleged to center on a marketing scheme whereby Pine Creek induced physicians to refer their patients to the facility by providing them with valuable marketing services.

13.     The *qui tam* investigation spanned more than three (3) years, resulting in a $7.5 million settlement with the Department of Justice (the "**DOJ**") and Pine Creek's execution of a five-year corporate integrity agreement in November 2017.

14.     In addition to the $7.5 million payment, the terms of the *qui tam* settlement included a Corporate Integrity Agreement (the "**CIA**") with the OIG "to promote compliance with the

---

[5] Ownership of PSG-PC Mgmt. as of Oct. 31, 2016 included: Physician Synergy Group, LLC (40%); Robert J. Henderson, MD (6.48%); Olayinka Ogunro, MD (3.24%).

statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs…" The compliance obligations, which included the establishment of a compliance program, written policies and procedures and annual reporting, amongst other requirements, extended for five (5) years from the date of execution.

### C. Partners Surgical Transaction

15.      In November 2017, Pine Creek entered into a transaction with Partners Surgical of Pine Creek, LLC ("**Partners Surgical**"), whereby the parties executed a $7.5 million convertible note to satisfy the DOJ *qui tam* settlement, which would convert to Pine Creek equity within 180 days.[6] In conjunction with this transaction, Partners Surgical became the new manager of Pine Creek under the same terms as the (then existing) management agreement with PSG-PC Mgmt. The transaction included an assignment and assumption agreement, as well as an asset purchase agreement whereby Partners Surgical purchased the assets of the PSG-PC Mgmt. business for $6,522,000.00. Thereafter, Partners Surgical purchased additional Pine Creek equity (20%) for $6.2 million resulting in a total equity stake of 45%. Less than two years later, Pine Creek would be forced to file bankruptcy.

### D. Bankruptcy

16.      As previously stated, Pine Creek filed a voluntary petition for bankruptcy relief under Chapter 11 of the Bankruptcy Code on September 13, 2019, in the Northern District of Texas, Dallas Division - *In re Pine Creek Medical Center, LLC,* Case No. 19-33079-hdh11 (the

---

[6] On May 1, 2018, Partners Surgical converted the note to equity, effectively gaining 25% ownership of Pine Creek.

"**Bankruptcy Case**"). Pine Creek has scheduled nearly $21 million in debt, and to date, more than $22.9 million in claims have been filed in the Bankruptcy Case.[7]

### E.  Defendant's Breach of Fiduciary Duties to Pine Creek

### i.      Failure to implement meaningful compliance and regulatory controls

17.    By virtue of his role on the Board, Dr. M. Ramirez owed Pine Creek fiduciary duties of trusty, loyalty, good faith and due care and was required to use his utmost ability to control and manage Pine Creek in a fair, just, honest and equitable manner. Dr. M. Ramirez habitually disregarded these duties by failing to monitor management decisions and finances of the Debtor in any capacity, and putting his own self-interest above that of Pine Creek and its creditors.

18.    As manager of Pine Creek, PSG-PC Mgmt. had authority to supervise both development and daily operations at Pine Creek and was also responsible for compliance, staffing, hospital procedures, record-keeping, internal controls, collection / payment of accounts, purchasing services and more. [Management Agreement at ¶¶ 2-7]**.** Notwithstanding, PSG-PC Mgmt.'s authority was subject to the direction of the Board (including Dr. M. Ramirez). [*Id*. at ¶1.2(a)].  As compensation for its management services, PSG-PC Mgmt. was entitled to 6% of Pine Creek's net patient revenues and had the right to pay itself both the management fees and reimbursable expenses from Pine Creek's accounts. [*Id.* at ¶¶ 6.1-6.3].

19.    Despite this, there was no meaningful compliance program at Pine Creek – regulatory or otherwise – and no attempt by the Board to implement one. This fact is borne out by the government investigation which resulted in a $7.5 million settlement under the False Claims Act for (purported) violations of the Anti-Kickback and Stark Laws.

---

[7] These amounts do not take into account those claims which the Trustee has settled, or which have been disallowed by the order of the Court.  These figures are provided solely for context. The Trustee reserves the right to contest all claims filed in the bankruptcy case.

20.     The evidence suggests that the "scheme" was, in fact, overt and well-known, with Pine Creek's staff blatantly disregarding federal regulations prohibiting remuneration for patient referrals.  In one instance, after receiving an email from a Synergy employee recounting recent efforts to get patient referrals to Pine Creek's new imaging center, including physician office visits wherein "…I bribed them with cupcakes, dropped off imaging orders and informed them that Pine Creek is now able to pre-cert your radiology patients" and reminding physicians that "[w]e plan to keep you up to date monthly on the number of referrals that are sent in by each of you," Dr. Jeffrey Toubin reached out to Pine Creek's CEO at the time directly, stating "[t]his has to be the most incriminating email for physician self referral ever sent. Ever heard of whistleblower rewards?"

> **From:** Jeffrey Toubin
> **Sent:** Thursday, January 29, 2015 9:19 AM
> **To:** Ramirez Cora MD; CORAZON M. MD RAMIREZ
> **Subject:** Fwd: Pine Creek Medical Center Imaging Center at Desoto
>
> This has to be the most incriminating email for physician self referral ever sent. Ever heard of whistleblower rewards?
>
> Jeffrey C. Toubin, M.D., F.A.C.S.
> Sent from iPhone 6 Plus

[OCIG-004777-004778].

21.     That Pine Creek lacked an adequate compliance program was further borne out during implementation of the CIA. In June 2016, Synergy hired Heidi Kocher ("**Kocher**"), of the law firm of Liles Parker, as Compliance Officer. In this position, Kocher was to assist Synergy with compliance for those healthcare entities it developed and managed, including Pine Creek.

22.     Thereafter, the Pine Creek Board hired Kocher as its Compliance Expert to assist in implementing the CIA. Kocher specifically noted in her Annual Report to the OIG that portions

of the compliance program which Pine Creek purported to have in place did not actually exist prior
to Pine Creek executing the CIA in November 2017.

> While PCMC did have a compliance program prior to signing the CIA, it was
> constrained in several aspects. **Some elements of a compliance program simply
> did not exist…**Thus, the first year under PCMC's CIA focused on implementing
> the CIA, launching certain aspects of a compliance program (such as routine
> monthly sanctions screening) and strengthening and reinvigorating other aspects
> (such as conducting monthly compliance committee meetings)…**Thus, in some
> ways it is unfair to PCMC and its personnel to insist on an "effective"
> compliance program, when there was so much work to be done to simply
> implement the CIA**.

[OCIG-009088] (emphasis added).

23.     It is telling that, in the opinion of an experienced compliance expert, Pine Creek
had an undeveloped and ineffective compliance program in late 2017. This is seven (7) years after
the passage of the Affordable Care Act, which mandated new compliance measures for healthcare
providers. Under the management of the Board and defendant M. Ramirez, Pine Creek had more
than half a decade to develop and implement an effective compliance program but failed to even
attempt to do so.

24.     That Kocher was hired by Synergy in the first place would seem to suggest that it
was making efforts to remediate the compliance issues at Pine Creek; however, Kocher's
employment terms reflect the fact that Pine Creek's management was *not* taking remediation
seriously. The role of Chief Compliance Officer should be part of a company's C-suite, but that
was not the case with Kocher's employment. Instead, she was consulted only on an as-needed
basis, and her employment contract states that it was anticipated she would dedicate only eight (8)
hours per week to Synergy and those entities under its management. [Compliance Officer Agmt.
at ¶ 1.1(b)]. This is a far cry from full-time, C-suite executive and is indicative of the importance,
or lack thereof, which Pine Creek's Board and management placed on compliance.

25.    In this way, regulatory compliance was not only disregarded at Pine Creek, but openly flouted. Those few individuals that were empowered to monitor the manager's actions in managing the hospital and PSG-PC Mgmt. – namely, the defendant and fellow members of the Board – had no incentive to do so, as they too stood to gain personally. The lack of compliance and internal controls directly contributed to the environment in which the kick-back scheme was able to flourish and resulted in significant damages to Pine Creek.

26.    Following Pine Creek's bankruptcy filing, Mark Shapiro ("**Shapiro**"), who was hired to wind down and liquidate the hospital as well as act as Pine Creek's fiduciary in the bankruptcy, spoke to the effect of the $7.5 million settlement on the company's operations. As detailed in the Disclosure Statement, the hospital's financial distress originated with the $7.5 million fine and the CIA, "which actions substantively contributed to the failure of the Debtor's business." [Dkt. No. 78 at p. 6].  In his testimony at the Disclosure Statement hearing, Shapiro specifically stated that the CIA and attendant fine had "started the… financial distress that the hospital was incurring" and it "was a continual slide from that point forward." [Dkt. No. 93 at p. 11].

27.    Further damage resulted from Pine Creek paying exorbitant management fees, despite not receiving the services it contracted for. From 2014 to 2017 Pine Creek expended more than $14 million in management fees, despite suffering crippling regulatory fines under PSG-PC Mgmt.'s grossly negligent supervision (and that of the Board).

**ii.    Grossly inefficient operations**

28.    Gross inefficiencies also persisted under PSG-PC Mgmt and the Board. In 2017, Partners Surgical commissioned a valuation of Pine Creek. The valuation reflected tremendous inefficiencies at Pine Creek as compared to industry norms while under the control of PSG-PC

Mgmt. and the Board. [J Taylor 2018 Valuation]. In particular, the analysis found operating expenses to be high as compared to the national average and the company's EBITDA to be unfavorably low while under the management of PSG-PC Mgmt. [*Id.* at pp. 8-9]

29.    Since 2016, operating expenses at Pine Creek averaged 98% of total revenue, as compared to 76% for the national average. [*Id.* at p. 8]. Effectively, PSG-PC Mgmt. was operating the company on the thinnest of margins - just 2%, as compared to 24% for the national average. Of this amount, medical / surgical supplies were highlighted as being "significantly greater than industry medians" – 42.4% as compared to 23%. [*Id.* at p. 9]. As it relates to operating profitability, Pine Creek's EBITDA was found to be only 6% as compared to the industry median of approximately 23.8%. [*Id.*].



Operating Ratios and Benchmarks

While PCMC provides both inpatient and outpatient services, Ambulatory Surgical Care Center ("ASC") operating ratios and benchmarks provide useful information by which to determine the relative stability and risk of PCMC. This comparison was as the majority of cases surgical cases performed at PCMC are on an outpatient basis.

| | PCMC 2017 | VMG Intellimarker Study* Median Nation |
|---|---|---|
| **Total Net Revenue** | **100%** | **100%** |
| Employee Salaries, Wages, and Benefits | 19.9% | 26.4% |
| Occupancy Costs | 10.1% | 6.1% |
| Medical/Surgical Supplies | 42.4% | 23.0% |
| Other Medical Costs | N/A | 0.3% |
| Insurance | 0.5% | 0.8% |
| General & Administrative (Includes Depr.) | 24.3% | 16.4% |
| **Total Operating Expenses** | **97.2%** | **76.2%** |
| **EBITDA** | **6.0%** | **23.8%** |

\* Source: *Multi-Specialty ASC Intellimarker 2017* published by VMG Health. Figures may not sum given that each data point was reported separately in the survey.

Total Operating Expenses for PCMC average 97.2% of Net Patient Revenue while Median ASC benchmarks average 76.2%. PCMC's Medical and Surgical supply expense is significantly greater than industry medians, but this is expected given the PCMC's case mix (i.e., orthopedic surgery) and the costly implants associated with such services. This increased supply expense is slightly offset by lower expenses in other categories, including employee salaries, wages, and benefits.

Regarding operating profitability, PCMC's 6.0% EBITDA margin compares unfavorably to the industry median of approximately 23.8%.

[*Id.*].

30.     These unfavorable trends are particularly disturbing because, as will be explained in detail herein, Pine Creek – while on Defendants' watch – was effectively paying two (2) different companies for management services at the time.

### iii.    Conflicts of interest

31.     Undoubtedly, egregious conflicts of interest were habitually ignored at Pine Creek. As detailed herein, the same decision-maker stood on both sides of practically every Pine Creek transaction and personally benefited from the hospital's business relationships, all of which were with entities other wholly controlled entities. Such a management structure directly violated Pine Creek's Code of Conduct.

> **V.    Employee Loyalty and Conflicts of Interest**
>
> PCMC expects its employees to serve the organization with undivided loyalty, and requires that its interests be placed ahead of any individual business or commercial interests.  Employees should avoid situations in which a conflict of interest, or the appearance of a conflict, could arise.

[Pine Creek Code of Conduct at p. 5].

32.     Despite the clear prohibition against conflicts of interest, there was no effort made on behalf of the Board, including defendant M. Ramirez, to curtail management's wasteful behavior.

33.     Evidence also reflects the fact that Pine Creek shunned traditional corporate formalities, such as having outside counsel attend board meetings, review meeting minutes and maintain the corporate minute book. One can surmise that Pine Creek and its leadership likely did not want the oversight that would come from involving outside counsel.

### F.  Abuse of Control & Gross Mismanagement

34.     In each instance, those individuals with the duty and ability to curtail Pine Creek's managers' self-serving actions – the Board, including Dr. M. Ramirez – neglected their fiduciary duties by turning a blind eye and permitting certain actors to run roughshod over Pine Creek and, ultimately, its creditors. This too constituted gross mismanagement and abuse of control.

35.     The Pine Creek Company Agreement specifically provided for a Board of Managers (the "**Board**") consisting of 10 individuals. [Pine Creek Company Agmt. at ¶ 7.2(a)]. The Board was given the authority to manage the business and affairs of Pine Creek, and in this role, appointed the decision-makers in charge of the day-to-day operations. [*Id.* at ¶ 7.5]. Dr. M. Ramirez served on the Board for five (5) years, from 2012-2017.

36.     As a member of the Board, Dr. M. Ramirez owed Pine Creek fiduciary duties of trust, loyalty, good faith and due care, but took no significant action to inquire into, investigate or restrain any of management's self-serving business decisions. In this way, he, along with his fellow Board members, permitted Pine Creek to operate more or less as a sole proprietorship. The Pine Creek Board operated as mere puppets of the management company and its principal.

37.     The Pine Creek Board (and Dr. M. Ramirez) turned a blind eye to numerous major red flags – namely, persistent and egregious conflicts of interest as it related to not only Pine Creek, but those companies tasked with managing Pine Creek.

38.     By abdicating full control to Pine Creek's management companies and their principal, the Board, including Dr. M. Ramirez, violated the Pine Creek Board of Manager Bylaws and their express duties thereunder. The Bylaws specifically provided that "[t]he management and control of [Pine Creek] shall be vested in the [BOM]," which "is responsible for the operation and performance of [Pine Creek]." [BOM Bylaws at 4.1(a)]. The Bylaws further provided that the

"[BOM] will ensure "services provided…. are provided safely and effectively, in an effective manner that permits [Pine Creek] to comply with applicable rules and standards," [4.1(i)] and "shall ensure compliance with all applicable laws, rules and regulations…" [4.1(r)].

### G. Corporate Waste

39.     Despite failing to institute any meaningful compliance or maintain requisite standards at Pine Creek, PSG-PC Mgmt. and Synergy were unjustly enriched by that entity to the tune of many millions of dollars.

40.     Synergy unlawfully derived millions in compensation from Pine Creek despite Synergy having no valid contract or agreement with that entity. Documents reflect that from 2013 – 2017 Synergy received as much as $14.6 million from Pine Creek for services which PSG-PC Mgmt. was contracted to provide, and for which that entity was simultaneously receiving management fees. [PineCreekOIG – 000332 at Tab 3 "PSG"].[8]

41.     Records reflect that over this same period of time, PSG-PC Mgmt. received $13.6 million from Pine Creek.[9] [PineCreekOIG – 000331]. To the extent both PSG-PC Mgmt. and Synergy received management related compensation, this represents improper double-dipping and both parties were unjustly enriched at the expense of Pine Creek and its creditors.

42.     By serving as nothing more than a "rubber stamp" on PSG-PC Mgmt. and Synergy's self-serving behavior and management decisions, the Board, including Dr. M. Ramirez, caused that entity to waste valuable corporate assets and incur millions of dollars of legal fees defending and settling the *qui tam* / OIG investigation. Over the four (4) years that Pine Creek

---

[8] "PineCreekOIG" is the prefix for those bates labelled documents provided to OIG by Pine Creek in response to the Dec. 1, 2017 document request pertaining to managers at Pine Creek. The referenced spreadsheet was prepared by Pine Creek and provided to the OIG in response to the document request of December 1, 2017, related managers at Pine Creek.

[9] Records reflect that from 2005 – 2018, PSG-PC Mgmt. received approximately $31 million from Pine Creek.

participated in the investigation, negotiation and settlement surrounding the *Qui Tam* Complaint,

nearly $2 million in legal fees were expended.[10]

| Year | Legal Fees |
|---|---|
| 2014 | $298,424 |
| 2015 | $322,588 |
| 2016 | $481,966 |
| 2017 | $884,903 |
| **Total** | **$1,987,881** |

43.     Pine Creek also expended many millions in management fees, essentially paying

PSG-PC Mgmt. and Synergy despite neither performing appropriate management services.

| Year | Management Fees |
|---|---|
| 2014 | $2,587,455 |
| 2015 | $3,624,451 |
| 2016 | $4,040,376 |
| 2017 | $4,411,271 |
| **Total** | **$14,663,553** |

## VI.    DAMAGES

44.     Damages for the unlawful conduct described herein may be predicated on Pine

Creek's precipitous fair market value decline over the relevant period. Fair market value is defined

by the IRS as "the price at which property would change hands between a willing buyer and a

---

[10] These amounts were gathered from Pine Creek's Form 1065 for years 2014 -2017.

willing seller when the former is not under any compulsion to buy and the latter is not under any

compulsion to sell, both parties having reasonable knowledge of the relevant facts." IRS Revenue

Ruling 59-60, 1959-1 C.B. 237.

45.    In this case, a valuation of Pine Creek was conducted in December 2015, prior to

public disclosure of the *qui tam* investigation and settlement with the DOJ. The fair market value

of Pine Creek as of December 31, 2015 was determined to be $35,992,000 (rounded to the nearest

thousand). Van Amburgh Valuation, submitted Oct. 10, 2016 at p. 6. Thereafter, following the

Partners Surgical transaction, a valuation of PCMC was conducted in 2018. The fair market value

of PCMC as of July 1, 2018 was determined to be $25,505,000 (rounded to the nearest thousand).[11]

J. Taylor Valuation, submitted Aug. 22, 2018 at pp. 13-14, 21. This represents a decrease in fair

market value of $10,487,000 in just over 2.5 years and is an appropriate measure of damages under

the circumstances.

## VII.    CONDITIONS PRECEDENT

46.    All conditions precedent to bring this suit have been performed or have occurred.

Specifically, the Plan Trustee brings this suit based on reasonable diligence in the circumstances

of the Bankruptcy Case and taking into account defendant, Dr. M. Ramirez's, known or reasonably

knowable affirmative defenses.

47.    During the course of this proceeding, the Plan Trustee may learn (through discovery

or otherwise) of additional actionable conduct and/or avoidable transfers made during the

fraudulent transfer period.  Likewise, the Trustee may learn additional information concerning

defendants' affirmative defenses.  It is Trustee's intention to avoid and recover all preferential and

fraudulent transfers made by Pine Creek of any interest of the Debtor in property and to or for the

benefit of Dr. M. Ramirez or any other transferee.  The Plan Trustee reserves his right to amend

this original Complaint to include: (i) further information regarding the avoidable payments, (ii)

additional avoidable payment, (iii) modifications of and/or revision to defendants' names, (iv)

additional defendants, and/or (v) additional causes of action (i.e., but not exclusively, 11 U.S.C. §

542, § 544, § 545, § 547 § 548 and § 549) (collectively, the "Amendments"), that may become

known to the Plan Trustee at any time during this adversary proceeding, through formal discovery

or otherwise, and for the Amendments to relate back to this original Complaint.

## VIII.   CAUSES OF ACTION

### A.  Count 1 – Breach of Fiduciary Duties

48.     The Plan Trustee incorporates by reference and re-alleges each and every allegation

set forth above, as though fully set forth herein.

49.     As a board member, Dr. M. Ramirez owed fiduciary duties to Pine Creek. In this

position, Dr. M. Ramirez utterly failed to ensure Pine Creek's managers implemented in good faith

meaningful compliance and regulatory controls. Such disregard for regulatory compliance fostered

an environment in which the kickback scheme described herein flourished, resulting in significant

regulatory penalties which were extremely damaging to Pine Creek. The evidence reflects that as

recently as late 2017 Pine Creek still did not have some of the fundamental elements of a

compliance program in place.  Considering the nature and risks associated with Pine Creek's

business, particularly as it relates to submissions for government reimbursement under heavily

regulated healthcare programs such as Medicare and Medicaid, defendant abdicated his fiduciary

obligations by permitting Pine Creek to operate without these internal safeguards in place.

50.     Dr. M. Ramirez abused the trust vested in him by virtue of his position and breached

his fiduciary duties of loyalty, utmost good faith and due care by utterly abdicating his duty of

oversight. As a result of the Board's sustained and systematic failure to exercise oversight, Dr. M. Ramirez and his fellow board members caused or allowed Pine Creek's business to be run almost entirely by one individual. As a corporate officer and member of the Board, Dr. M. Ramirez was empowered to monitor that individual's actions in managing the hospital and manager PSG-PC Mgmt.; however, there is no indication that he – or his fellow board members – ever questioned the management company and its principal's self-serving actions or attempted to rein in her destructive decision making. In this way, Dr. M. Ramirez allowed egregious conflicts of interest to proliferate to the detriment of Pine Creek.

51.     Dr. M. Ramirez further abdicated his duties of utmost good faith and due care by permitting Pine Creek to operate with gross inefficiencies. These inefficiencies resulted in operating expenses that were exponentially high as compared to the national average and an unfavorably low EBITDA. By permitting Pine Creek to operate, for years, on a rail thin margin instead of instituting cost-saving measures or seeking out lower-cost vendor alternatives, Dr. M. Ramirez and his fellow board members abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Pine Creek in a manner consistent with a well-run hospital.

52.     By the acts and omissions alleged herein, Dr. M. Ramirez abandoned and abdicated his responsibilities and fiduciary duties with regard to prudently managing the assets and business of Pine Creek in a manner consistent with the company's best interest and that of its creditors. The misconduct alleged was not due to an honest error in business judgment, but rather to gross mismanagement, bad faith and / or reckless disregard of the rights and interests of Pine Creek. As a result of the foregoing, Dr. M. Ramirez has participated in harming Pine Creek and has breached the fiduciary duties owed to that entity.

53.    The wrongful conduct of Dr. M. Ramirez and his fellow board members enabled Pine Creek to waste valuable corporate assets defending and settling regulatory investigations which they had the ability – and duty – to circumvent through regulatory compliance and internal controls. Dr. M. Ramirez's abject disregard for his fiduciary duties also resulted in Pine Creek expending millions in management fees while essentially paying two separate companies, neither of which were performing appropriate management services. Finally, the wrongful conduct contributed to Pine Creek's eventual bankruptcy filing less than two (2) years after Partners Surgical took over management of the facility. To date, more than $22.9 million in claims have been filed against Pine Creek in the Bankruptcy Case.

**B.  Count 2 – Corporate Waste**

54.    The Plan Trustee incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

55.    As a result of the foregoing breaches of fiduciary duty, and by failing to properly consider the interests of Pine Creek and its creditors, defendant M. Ramirez caused Pine Creek to waste valuable corporate assets. This included the incurrence of millions in legal fees to defend and settle regulatory investigations from which Pine Creek never fully recovered. All the while, as a member of the Board, Dr. M. Ramirez never acted to implement sufficient compliance or regulatory controls as mandated by the Management Agreement, the Pine Creek Board of Managers Bylaws and the Affordable Care Act.

56.    By abdicating his fiduciary duties, Dr. M. Ramirez further caused Pine Creek to waste corporate assets on management fees payable to manager PSG-PC Mgmt. in amounts that far exceeded the value provided. From 2014 – 2017, tax records reflect that Pine Creek paid more than $14.5 million in management fees, while simultaneously compensating Synergy for purported

services which the management company was contractually obligated to perform. This, despite neither company providing sufficient management services as detailed herein.

57.      As a result of the waste of corporate assets, Dr. M. Ramirez is liable to Pine Creek for the economic losses attributable to these wrongful actions in an amount to be finally determined according to proof at the time of trial.

### C.  Count 3 – Unjust Enrichment

58.      The Plan Trustee incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

59.      Throughout his tenure as a board member, Dr. M. Ramirez derived compensation from Pine Creek in the form of board fees, despite not fulfilling his responsibilities to the organization. As alleged herein, Dr. M. Ramirez breached his fiduciary duties and / or abused his position of control at Pine Creek and is, therefore, not justified in retaining the benefits conferred upon him.

60.      The unlawful enrichment of Dr. M. Ramirez is directly and causally related to the detriment of Pine Creek, and this compensation was received under such circumstances that it would be inequitable for it to be retained without repayment.

### D.  Count 4 – Abuse of Control

61.      The Plan Trustee incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

62.      The misconduct of manager PSG-PC Mgmt., allowed by Dr. M. Ramirez as a member of the Board, as alleged herein, constituted an abuse of his ability to control and influence Pine Creek, for which he is legally responsible.

63.     As a direct and proximate result of Dr. M. Ramirez's abuse of control, Pine Creek suffered insurmountable economic damages that eventually left it unable to operate as a going concern, despite the sale to Partners Surgical in late 2017.  As a result of the misconduct alleged herein, Dr. M. Ramirez is liable to the Plan Trustee for the economic losses attributable to these wrongful actions in an amount to be determined according to proof at the time of trial

### E.  Count 5 – Gross Mismanagement

64.     The Plan Trustee incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

65.     By the actions alleged herein, Dr. M. Ramirez, in his role as a board member of Pine Creek, either directly or through aiding and abetting, abandoned and abdicated his responsibilities and fiduciary duties with regard to prudently managing the assets and compliance of Pine Creek in a manner consistent with the operations of a well-functioning hospital.  The wrongful conduct particularized herein was not due to an honest error in judgment, but rather to gross mismanagement, bad faith and/or reckless disregard of the rights and interests of Pine Creek, its shareholders and creditors.  The actions defendant, Dr. M. Ramirez, grossly deviated from the standard of care that prudent managers would observe in light of the substantial risk of significant harm that can occur due to systematic oversight and control deficiencies.

66.     As a result of the misconduct alleged herein, Dr. M. Ramirez is liable to the Plan Trustee for the economic losses attributable to these wrongful actions in an amount to be determined according to proof at the time of trial.

### F.  Count 6 – Avoidance and Recovery of Constructively Fraudulent Transfers Pursuant to 11 U.S.C. §§ 544, 548(a)(1)(B) and 550(a).

67.     The Plan Trustee incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

68.     Between September 13, 2017 and the Petition Date (the "**2-Year Fraudulent Transfer Period**"), defendant M. Ramirez received transfers from Pine Creek, as itemized below, in the total amount of $14,099.00 (the "**2-Year Fraudulent Transfers**").

| Transferee | Date Cleared | Amount | Account | Type of Transfer | Source |
|---|---|---|---|---|---|
| Manuel Ramirez, M.D. | 11/10/2017 | $300.00 | BBVA 7576 | Chk 88112 | Meditech |
| Manuel Ramirez, M.D. | 11/21/2017 | $1,000.00 | BBVA 7576 | Chk 88400 | Meditech |
| Manuel Ramirez, M.D. | 11/20/2017 | $2,720.00 | BBVA 7576 | Chk 88595 | Meditech |
| Manuel Ramirez, M.D. | 11/24/2017 | $600.00 | BBVA 7576 | Chk 88698 | Meditech |
| Manuel Ramirez, M.D. | 01/08/2018 | $300.00 | BBVA 7576 | Chk 89045 | Meditech |
| Manuel Ramirez, M.D. | 04/30/2018 | $1,800.00 | BBVA 7576 | Chk 90524 | Meditech |
| Manuel Ramirez, M.D. | 4/30/2018 | $300.00 | BBVA 7576 | Chk 90659 | Meditech |
| Manuel Ramirez, M.D. | 01/04/2019 | $3,317.00 | CFB 8604 | Chk 99852 | Meditech |
| Manuel Ramirez, M.D. | 01/03/2019 | $3,762.00 | CFB 8604 | Chk 100037 | Meditech |

69.     These payments made during the 2-Year Fraudulent Transfer Period were all made to Dr. M. Ramirez individually, and all were made for his benefit.

70.     Because of (i) the breaches of fiduciary duty detailed hereinabove (ii) the general failure to discharge the responsibilities described herein, and (iii) the unjust enrichment of Dr. M. Ramirez, Pine Creek received less than reasonably equivalent value for the 2-Year Fraudulent Transfers.

71.     Pine Creek was insolvent by 2016, prior to the 2-Year Fraudulent Transfer Period. In conjunction with its (management-induced) diminishing enterprise value over this period, Pine Creek also became unable to pay its debts as they became due in the usual course of its business. This is evidenced by Pine Creek's internal records, as well as the bankruptcy filings.

72.     Several creditors' claims filed in the Bankruptcy Case relate back to 2016 and even earlier.  For example, Head and Spine Institute of Texas has a claim of $5,950.00 against Pine Creek, with unpaid invoices going back to May 16, 2016. *See* Claim No. 7.  MedUSA Group, LLC has a claim of $33,275.90 against Pine Creek, with unpaid invoices going back to July 2, 2014. *See* Claim No. 46. Further, at the August 2, 2017 board meeting, Dr. Ramirez acknowledged a likely default of the then-agreed $1.95 million initial settlement payment to the DOJ, because Pine Creek did not have sufficient cash on hand, nor were they in a position to borrow the funds from because Pine Creek's financial reports were so poorly prepared that it was impossible to obtain even an uncertified audit report.

73.     Throughout the 2-Year Fraudulent Transfer Period, Pine Creek was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the business was an unreasonably small capital.

74.     Throughout the 2-Year Fraudulent Transfer Period, Pine Creek intended to incur, or believed it would incur, obligations, notwithstanding the fact that the obligations would be beyond its ability to pay as they matured.

75.     Pine Creek made the 2-Year Fraudulent Transfers for the benefit of Dr. M. Ramirez and not in the ordinary course of business.

76.     Defendant, Dr. M. Ramirez, is the initial transferee of the 2-Year Fraudulent Transfer and the party for whose benefit the transfers were made.

77.     As a result of these circumstances, the 2-Year Fraudulent Transfers should be avoided under 11 U.S.C. §§ 544, 548(a)(1)(B), and the Plan Trustee is entitled to recover the amount of the 2-Year Fraudulent Transfers pursuant to 11 U.S.C. § 550(a).

**G.  Count 7 – Avoidance and Recovery of Fraudulent Transfers Made with the Actual Intent to Hinder, Delay or Defraud Pursuant to 11 U.S.C. §§ 544, 548(a)(1)(B) and 550(a).**

78.     The Plan Trustee incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

79.     Within two (2) years of the Petition Date, Defendant Dr. M. Ramirez received the 2-Year Fraudulent Transfers, as described in Count 6 above. The 2-Year Fraudulent Transfers were each transfers of property belonging to Pine Creek.

80.     Each of the 2-Year Fraudulent Transfers was made with the intent to hinder, delay or defraud any entity to which Pine Creek was or became indebted, on or after the date that such transfer was made or such obligation was incurred. Numerous badges of fraud surround the 2-Year Fraudulent Transfers to the defendants identified herein.

81.     As an initial matter, Dr. M. Ramirez constitutes an insider of debtor Pine Creek by virtue of his position as a board member of the Debtor.

82.     Further, Pine Creek was insolvent by 2016, prior to the 2-Year Fraudulent Transfer Period. In conjunction with its (management-induced) diminishing enterprise value over this period, Pine Creek also became unable to pay its debts as they became due in the usual course of its business. This is evidenced by Pine Creek's internal records, as well as the bankruptcy filings.

83.     The 2-Year Fraudulent Transfers are avoidable transfers made to initial and / or subsequent transferees of Pine Creek's property.

84.     As a result of these circumstances, the 2-Year Fraudulent Transfers should be avoided under 11 U.S.C. §§ 544, 548(a)(1)(A), and the Plan Trustee is entitled to recover the amount of the 2-Year Fraudulent Transfers pursuant to 11 U.S.C. § 550(a).

85.     The 2-Year Fraudulent Transfers were each made for less than reasonably equivalent value and not in good faith. The badges of fraud surrounding the 2-Year Fraudulent Transfers, among other things, vitiate any claim of good faith on the part of the defendant.

**H. Count 8 - Avoidance and Recovery of Constructively Fraudulent Transfers Pursuant to State Fraudulent Transfer Law (Tex. Bus. & Com. Code §§ 24.005(a)(2), 24.006(a), and 24.008) and 11 U.S.C. § 544.**

86.     The Plan Trustee incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

87.     Between September 13, 2015 and the Petition Date (the "4-Year Fraudulent Transfer Period"), defendant, Dr. M. Ramirez, received transfers from Pine Creek, as itemized below, in the total amount of $68,559.00 (the "4-Year Fraudulent Transfers"):

| Transferee | Date Cleared | Amount | Account | Type of Transfer | Source |
|---|---|---|---|---|---|
| Manuel Ramirez, M.D. | 02/16/2016 | $5,030.00 | BBVA 7576 | Chk 80346 | Meditech |
| Manuel Ramirez, M.D. | 03/14/2016 | $4,500.00 | BBVA 7576 | Chk 80783 | Meditech |
| Manuel Ramirez, M.D. | 03/15/2016 | $4,500.00 | BBVA 7576 | Chk 80784 | Meditech |
| Manuel Ramirez, M.D. | 03/14/2016 | $4,500.00 | BBVA 7576 | Chk 80785 | Meditech |
| Manuel Ramirez, M.D. | 03/21/2016 | $3,000.00 | BBVA 7576 | Chk 80786 | Meditech |
| Manuel Ramirez, M.D. | 05/05/2016 | $1,800.00 | BBVA 7576 | Chk 80926 | Meditech |
| Manuel Ramirez, M.D. | 05/05/2016 | $1,030.00 | BBVA 7576 | Chk 81329 | Meditech |
| Manuel Ramirez, M.D. | 09/26/2016 | $4,500.00 | BBVA 7576 | Chk 82912 | Meditech |
| Manuel Ramirez, M.D. | 02/06/2017 | $21,810.00 | BBVA 7576 | Chk 84576 | Meditech |

| Manuel Ramirez, M.D. | 05/12/2017 | $2,000.00 | BBVA 7576 | Chk 86225 | Meditech |
|---|---|---|---|---|---|
| Manuel Ramirez, M.D. | 05/30/2017 | $300.00 | BBVA7576 | Chk 86504 | Meditech |
| Manuel Ramirez, M.D. | 06/29/2017 | $890.00 | BBVA 7576 | Chk 87132 | Meditech |
| Manuel Ramirez, M.D. | 07/28/2017 | $300.00 | BBVA 7576 | Chk 87395 | Meditech |
| Manuel Ramirez, M.D. | 09/11/2017 | $300.00 | BBVA 7576 | Chk 87797 | Meditech |
| Manuel Ramirez, M.D. | 11/10/2017 | $300.00 | BBVA 7576 | Chk 88112 | Meditech |
| Manuel Ramirez, M.D. | 11/21/2017 | $1,000.00 | BBVA 7576 | Chk 88400 | Meditech |
| Manuel Ramirez, M.D. | 11/20/2017 | $2,720.00 | BBVA 7576 | Chk 88595 | Meditech |
| Manuel Ramirez, M.D. | 11/24/2017 | $600.00 | BBVA 7576 | Chk 88698 | Meditech |
| Manuel Ramirez, M.D. | 01/08/2018 | $300.00 | BBVA 7576 | Chk 89045 | Meditech |
| Manuel Ramirez, M.D. | 04/30/2018 | $1,800.00 | BBVA 7576 | Chk 90524 | Meditech |
| Manuel Ramirez, M.D. | 4/30/2018 | $300.00 | BBVA 7576 | Chk 90659 | Meditech |
| Manuel Ramirez, M.D. | 01/04/2019 | $3,317.00 | CFB 8604 | Chk 99852 | Meditech |
| Manuel Ramirez, M.D. | 01/03/2019 | $3,762.00 | CFB 8604 | Chk 100037 | Meditech |

88.     These payments made during the 4-Year Fraudulent Transfer Period were all made to Dr. M. Ramirez individually, and were made for his benefit.

89.     Because of (i) the breaches of fiduciary duty detailed hereinabove (ii) the general failure to discharge the responsibilities described herein, and (iii) the unjust enrichment of Dr. M. Ramirez, Pine Creek received less than reasonably equivalent value for the 4-Year Fraudulent Transfers.

90.     Pine Creek was insolvent by 2016, prior to the 4-Year Fraudulent Transfer Period. In conjunction with its (management-induced) diminishing enterprise value over this period, Pine

Creek also became unable to pay its debts as they became due in the usual course of its business. This is evidenced by Pine Creek's internal records, as well as the bankruptcy filings.

91.     Several creditors' claims filed in the Bankruptcy Case relate back to 2016 and even earlier.  For example, Head and Spine Institute of Texas has a claim of $5,950.00 against Pine Creek, with unpaid invoices going back to May 16, 2016.  *See* Claim No. 7.  MedUSA Group, LLC has a claim of $33,275.90 against Pine Creek, with unpaid invoices going back to July 2, 2014. *See* Claim No. 46.  Further, at the August 2, 2017 board meeting, Dr. Cora Ramirez acknowledged a likely default of the then-agreed $1.95 million initial settlement payment to the DOJ, because Pine Creek did not have sufficient cash on hand, nor were they in a position to borrow the funds from because Pine Creek's financial reports were so poorly prepared that it was impossible to obtain even an uncertified audit report

92.     Throughout the 4-Year Fraudulent Transfer Period, Pine Creek was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the business was an unreasonably small capital.

93.     Throughout the 4-Year Fraudulent Transfer Period, Pine Creek intended to incur, or believed it would incur, obligations, notwithstanding the fact that the obligations would be beyond its ability to pay as they matured.

94.     As a result of these circumstances, the 4-Year Fraudulent Transfers should be avoided under Tex. Bus. & Com. Code §§ 24.005(a)(2), 24.006(a), and the Plan Trustee is entitled to recover the amount of the 4-Year Fraudulent Transfers pursuant to Tex. Bus. & Com. Code § 24.008.

**I.     Count 9 - Avoidance and Recovery of Fraudulent Transfers Made with the Actual Intent to Hinder, Delay or Defraud Pursuant to State Fraudulent Transfer Law (Tex. Bus. & Com. Code §§ 24.005(a)(1) and 24.008) and 11 U.S.C. § 544.**

95.     The Plan Trustee incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

96.     Within four (4) years of the Petition Date, Defendant, Dr. M. Ramirez, received the 4-Year Fraudulent Transfers, as described in Count 8 above. The 4-Year Fraudulent Transfers were each transfers of property belonging to Pine Creek.

97.     Each of the 4-Year Fraudulent Transfers was made with the intent to hinder, delay or defraud any entity to which Pine Creek was or became indebted, on or after the date that such transfer was made or such obligation was incurred. Numerous badges of fraud surround the 4-Year Fraudulent Transfers to the defendants identified herein.

98.     As an initial matter, Dr. M. Ramirez constitutes an insider of debtor Pine Creek by virtue of his position as a board member of the Debtor.

99.     Further, Pine Creek was insolvent by (at least) 2016. In conjunction with its (management-induced) diminishing enterprise value over this period, Pine Creek also became unable to pay its debts as they became due in the usual course of its business. This is evidenced by Pine Creek's internal records, as well as the bankruptcy filings.

100.    The 4-Year Fraudulent Transfers are avoidable transfers made to initial and / or subsequent transferees of Pine Creek's property.

101.    As a result of these circumstances, the 4-Year Fraudulent Transfers should be avoided under Tex. Bus. & Com. Code §§ 24.005(a)(1), and the Plan Trustee is entitled to recover the amount of the 4-Year Fraudulent Transfers pursuant to Tex. Bus. & Com. Code § 24.008.

102.    The 4-Year Fraudulent Transfers were each made for less than reasonably equivalent value and not in good faith. The badges of fraud surrounding the 4-Year Fraudulent Transfers, among other things, vitiate any claim of good faith on the part of the defendant.

## IX.    PRAYER

WHEREFORE, the Plan Trustee respectfully requests that this Court enter judgment against the defendant, Dr. M. Ramirez, and award the Trustee (i) economic damages suffered by the estate of Pine Creek for defendant's negligence, gross negligence, and breaches of fiduciary duty in carrying out his role; (ii) exemplary damages on any and all causes of action permitting such damages; (iii) costs of court, and fees and expenses as permitted; and (iv) such other and further relief as this Court may deem just and proper.

Dated: July 13, 2022.

By: */s/ Shannon S. Thomas*
Shannon S. Thomas
State Bar No. 24088442
Zachary G. Levick
State Bar No. 24119380
ROCHELLE McCULLOUGH, LLP
325 N. St. Paul Street, Suite 4500
Dallas, Texas 75201
Telephone:  214-953-0182
Facsimile:  214-953-0185
sthomas@romclaw.com
zlevick@romclaw.com

ATTORNEYS FOR KEVIN D. MCCULLOUGH,
PLAN TRUSTEE OF THE PINE CREEK MEDICAL
CENTER, LLC PLAN TRUST